IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>Plaintiff,<br><br>v.<br><br>JAMES BALLENGEE,<br>LISBON PROCESSING, L.L.C.,<br>and LISBON REFINERY J.V., L.L.C.,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)  Civil Action No. _____<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## COMPLAINT

The United States of America, by the authority of the Attorney General of the United

States and through the undersigned attorneys, acting at the request of the Administrator of the

United States Environmental Protection Agency ("EPA"), files this Complaint and alleges as

follows:

## NATURE OF THE ACTION

This is a civil action by the United States of America against James Ballengee, Lisbon

Processing, L.L.C., and Lisbon Refinery J.V., L.L.C. ("Defendants") for injunctive relief and

civil penalties pursuant to Section 113(b) of the Clean Air Act, 42 U.S.C. § 7413(b); Section

311(b) of the Clean Water Act, 33 U.S.C. § 1321(b); Section 3008(a) of the Resource

Conservation and Recovery Act of 1976 ("RCRA"), 42 U.S.C. § 6928(a); and the regulations

1

promulgated pursuant to these statutes, for violations at a petroleum storage facility located at 18647 Highway 2, Lisbon, Claiborne Parish, Louisiana, 71048 (the "Facility").

## JURISDICTION, VENUE, AND NOTICE

1. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1345, and 1355;  Section 113(b) of the Clean Air Act, 42 U.S.C. § 7413(b); Section 311(b)(7)(E) of the Clean Water Act, 33 U.S.C. § 1321(b)(7)(E) and Section 3008(a)(1) of RCRA, 42 U.S.C. § 6928(a)(1).

2. Venue is proper in this judicial district under 28 U.S.C. §§ 1391(b) and 1395(a), as well as Section 113(b) of the Clean Air Act, 42 U.S.C. § 7413(b), Section 311(b)(7)(E) of the Clean Water Act, and Section 3008(a) of RCRA, 42 U.S.C. § 6928(a), because the violations occurred in, and Defendants do business and/or reside in, this judicial district.

3. Notice was given to Defendants pursuant to Section 113(a)(1) of the Clean Air Act, 42 U.S.C. § 7413(a), on or about May 3, 2011.

## DEFENDANTS

4. Defendant Lisbon Refinery J.V., L.L.C. ("Lisbon Refinery"), a Louisiana limited liability company, currently owns the Facility and has owned the Facility at all times relevant to this action.  Additionally, from approximately March through August 2009, it operated the Facility as a petroleum storage facility.

5. Defendant Lisbon Processing, L.L.C. ("Lisbon Processing"), a Louisiana limited liability company, leased the Facility from approximately February through September 2007, and was the operator of record of the Facility during that time period according to filings made to the Louisiana Department of Environmental Quality ("LDEQ").

6. Defendant James Ballengee is a Member and Manager of Lisbon Processing and Lisbon Refinery.  On information and belief, Ballengee personally directed the operations at the Facility and was the principal decision-maker regarding environmental compliance and cleanup. Ballengee is therefore an "operator" within the meaning of Section 113(h) of the Clean Air Act, 42 U.S.C. § 7413(h), an "operator" and a "person in charge" within the meaning of Section 311(b)(7)(A) of the Clean Water Act, 33 U.S.C. § 1321(b)(7)(A), and an "operator" within the meaning of RCRA § 3005(a), (e), 42 U.S.C. §§ 6925(a), (e); 40 C.F.R. §§ 260.10, 270.1(b); LAC 33:V.303.B.

7. At all relevant times, each defendant is and has been a "person" within the meaning of Section 1004(15) of RCRA, 42 U.S.C. § 6903(15); Section 302(e) of the Clean Air Act, 42 U.S.C. §7602(e); and Section 311(7) of the Clean Water Act, 33 U.S.C. § 1321(7).

## GENERAL ALLEGATIONS

### 1. Description of Facility

8. Defendants James Ballengee and/or Lisbon Refinery acquired the Facility in approximately 1998.

9. At the time it was acquired by Defendants, the Facility contained an abandoned refinery and a number of above-ground petroleum storage tanks.

10. The Facility has fourteen petroleum storage tanks.  The tanks are numbered sequentially: A1, B2, C3, ... through N14.  There is also a loading rack at the facility for the loading and unloading of petroleum tanker trucks.

11. The Facility is located within 100 yards of an unnamed perennial creek ("the Creek"), which is a tributary of Fivemile Creek, which is a perennial tributary of Bayou D'Arbonne, which is navigable in fact.

**2. Operations 2006–2007**

12. In approximately August of 2006, one or more Defendants began storing petroleum liquids in above-ground storage tanks on the west side of the Facility.  Defendants did not have an air permit for the storage of petroleum liquids.

13. In September of 2006, LDEQ began receiving complaints from neighbors regarding odors emanating from the Facility.

14. In October of 2006, after LDEQ responded to an odor complaint, Defendant James Ballengee told an LDEQ inspector that petroleum product was being stored in two 20,000 barrel tanks at the Facility, and that he was working to install a chemical process that would lessen the odor from the product, after which the product would be sold.

15. Tanks B2 and C3 are the only two tanks at the Facility with a capacity of 20,000 barrels.

16. There was an additional odor complaint in January of 2007.

17. After receiving odor complaints in March of 2007, LDEQ conducted an inspection of the facility from March 21 through 23, 2007.  During inspections on those days, LDEQ found that, *inter alia*, Tanks A1, B2, C3, D4, F6, I9, and J10 were storing petroleum product.

18. During the March 2007 inspection, LDEQ inspectors also observed the tanks at the Facility with a Thermacam GasFindIR camera, and discovered vapors leaking from the roof vents of Tanks D4 and F6.

19. An LDEQ inspection conducted on April 11, 2007 revealed that Tanks A1, B2, C3, D4, F6, and I9 were storing petroleum product, and that those the tanks had leaking roof vents.

20. One or more Defendants applied for an air permit from LDEQ on or about April 26, 2007.  This application was never approved.

21. One or more Defendants submitted a revised air permit application on or about June 12, 2007. This application was never approved.

22. On July 5, 2007, EPA conducted an inspection of the Facility and used a Thermacam GasFindIR camera to record leaking fumes from Tanks A1, B2, C3, D4, and F6.

23. During the July 5, 2007 inspection, EPA requested records regarding the petroleum liquids that were being, and had been, stored at the Facility. Defendants failed to produce any records dating earlier than April 1, 2007, and failed to produce any records regarding the true vapor pressure of the material being stored dating earlier than May 1, 2007.

24. On July 25, 2007, EPA conducted a follow-up inspection of the Facility, and used a Thermacam GasFindIR camera to record leaking fumes from Tanks A1, B2, C3, D4, F6, and I9.

25. On or about August 7, 2007, in response to Cease and Desist Orders that had been issued by LDEQ and EPA, one or more Defendants removed the remaining petroleum product from the tanks and temporarily ceased operations at the Facility.

### 3. June 21, 2007 Oil Spill

26. On or about June 21, 2007, a valve on Tank I9 was left open, causing approximately 205 barrels (8,610 gallons) of petroleum liquids to be released into the environment.

27. The spilled petroleum product escaped from the Facility through a gap in a protective berm, traveled approximately one hundred yards down gradient from the tank, and entered the Creek.

28. Photographs taken of the Creek the day after the spill show that the spill caused a sheen and turned the Creek reddish-brown.

29. The spill contaminated at least two miles of the Creek. The spill caused numerous wildlife deaths in this area, including the deaths of fish, crawfish, foxes, rabbits, rodents, birds, frogs, snakes, and turtles.

30. Six area residents went to the hospital because of fumes from the spill.

### 4. 2009 Operations

31. On or about January 30, 2009, one or more Defendants submitted an air permit application to LDEQ requesting permission to store crude oil with a Reid Vapor Pressure (RVP) of less than 4 psi.

32. On or about March 2, 2009, Defendants recommenced the storage of petroleum liquids at the Facility. At this time, their air permit application had not been approved by LDEQ.

33. On March 16, 2009, LDEQ approved the air permit application to store crude oil with an RVP of less than 4 psi.

34. On April 1, 2009, EPA undertook an inspection of the Facility.

35. On April 8, 2009, Defendants, for the first time, analyzed samples from Tanks A1 and B2 for their RVP. The RVP values of Tanks A1 and B2 were recorded as being 10.4 psi and 10.1 psi, respectively.

36. After authorities notified one or more Defendants that they were storing petroleum liquids with Reid Vapor Pressures in excess of their permit limits, one or more Defendants completed removal of the petroleum liquids from the Facility in August, 2009.

### STATUTORY AND REGULATORY FRAMEWORK
### CLEAN AIR ACT

37. The Clean Air Act establishes a regulatory scheme designed to protect and enhance the quality of the nation's air so as to promote the public health and welfare. Section 101(b)(1) of the Clean Air Act, 42 U.S.C. § 7401(b)(1).

38. The Clean Air Act requires EPA to promulgate New Source Performance Standards ("NSPS") for stationary sources of air pollution that, in EPA's judgment, cause, or contribute significantly to, air pollution which may reasonably be anticipated to endanger public health or welfare. Section 111(b) of the Clean Air Act, 42 U.S.C. § 7411(b).

39. The Clean Air Act authorizes EPA to enforce NSPS regulations. Sections 111(c) and 113 of the Clean Air Act, 42 U.S.C. §§ 7411(c), 7413.

40. A "new source" subject to NSPS is any stationary source that is constructed or modified after the date of publication of the applicable NSPS standard. 42 U.S.C. § 7411(a)(2)

41. After the effective date for NSPS, it is "unlawful for any owner or operator of any new source to operate such source in violation of any standard of performance applicable to such source." 42 U.S.C. § 7411(e).

42. An "affected facility" under NSPS is "…with reference to a stationary source, any apparatus to which a standard is applicable." 40 C.F.R. § 60.2.

43. The NSPS regulations governing petroleum storage vessels are at 40 C.F.R. Part 60, Subparts K–Kb.

44. An "affected facility" under 40 C.F.R. Part 60, Subpart K (a "Subpart K Tank") is "each storage vessel for petroleum liquids" which has a capacity greater than 65,000 gallons and "commences construction or modification after June 11, 1973, and prior to May 19, 1978." 40 C.F.R. §§ 60.110(a) and 60.110(c)(2).

45. An owner or operator of a Subpart K Tank must store petroleum liquids as follows: "If the true vapor pressure of the petroleum liquid as stored is greater than 11.1 pounds per square inch absolute (psia), the storage vessel shall be equipped with a vapor recovery system or its equivalent." 40 C.F.R. § 60.112(a)(2).

46. The owner or operator of a Subpart K Tank is required to "maintain a record of the petroleum liquid stored, the period of storage, and the maximum true vapor pressure of that liquid during the respective storage period."  40 C.F.R. § 60.113(a).

47. An "affected facility" under 40 C.F.R. Part 60, Subpart Ka (a "Subpart Ka Tank") is a storage vessel with a capacity greater than 40,000 gallons "that is used to store petroleum liquids for which construction is commenced after May 18, 1978."  40 C.F.R. § 60.110a(a).

48. An owner or operator of a Subpart Ka Tank "which contains a petroleum liquid which, as stored, has a true vapor pressure greater than 76.6 kPa (11.1 psia), shall equip the storage vessel with a vapor recovery system...and a vapor return or disposal system...." 40 C.F.R. § 60.112a(b).

49. An owner or operator of a Subpart Ka Tank "shall maintain a record of the petroleum liquid stored, the period of storage, and the maximum true vapor pressure of that liquid during the respective storage period." 40 C.F.R. § 60.115a(a).

50. An "affected facility" under 40 C.F.R. Part 60, Subpart Kb (a "Subpart Kb Tank") is "each storage vessel with a capacity greater than or equal to 75 cubic meters ($m^3$) that is used to store volatile organic liquids (VOL) for which construction, reconstruction, or modification is commenced after July 23, 1984."  40 C.F.R. § 60.110b(a).

51.  An owner of operator of a Subpart Kb Tank "which contains a VOL [Volatile Organic Liquid] that, as stored, has a maximum true vapor pressure greater than or equal to 76.6 kPa [11.109 psia] shall equip each storage vessel with one of the following: (1) A closed vent system and control device..." or "(2) A system equivalent...." 40 C.F.R. § 60.112b(b).

52. The owner or operator of each Subpart Kb Tank with a design capacity greater than or equal to 151 $m^3$ storing a liquid with a maximum true vapor pressure greater than or equal to 3.5 kPa [.5075 psia] "shall maintain a record of the VOL stored, the period of storage, and the

8

maximum true vapor pressure of that VOL during the respective storage period." 40 C.F.R. § 60.116b(c).

53. In addition to all other requirements, "owners and operators [of an affected facility under 40 C.F.R. Part 60] shall, to the extent practicable, maintain and operate any affected facility including associated air pollution control equipment in a manner consistent with good air pollution control practice for minimizing emissions...." 40 C.F.R. §60.11(d).

54. Under Section 110 of the Clean Air Act, 42 U.S.C. § 7410, States may promulgate State Implementation Plans ("SIPs"), which provide for the maintenance and improvement of air quality within the respective State. SIPs must include enforceable emissions limitations and control measures as may be necessary or appropriate to meet the applicable requirements of the Clean Air Act, including New Source Performance Standards. *Id.*

55. EPA has approved, as part of the Louisiana SIP, regulations requiring stationary sources of air pollution to apply for permits prior to operation, and requiring those permit applications to include pertinent data as may be necessary for a good understanding of the proposal for air emissions. 54 Fed. Reg. 09795, 40 C.F.R. §§ 52.970(c)(58), 52.999(c)(49) (incorporating into the Louisiana SIP former LAC 33:III:505.A, H).

56. The United States may bring a civil action against any person who has violated any requirement or prohibition of the Clean Air Act (including a requirement or prohibition of an applicable SIP, or an NSPS regulation) by filing a civil action in federal district court. 42 U.S.C. § 7413.

57. Section 113(b) of the Clean Air Act, 42 U.S.C. § 7413(b) (as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, and the Debt Collection Improvements Act of 1996, 31 U.S.C. § 3701, as set forth at 40 C.F.R. § 19.4), authorizes a civil

penalty of up to $32,500 per day for each violation of the Clean Air Act occurring on or after March 16, 2004 through January 11, 2009, and a civil penalty of up to $37,500 per day for each violation of the Clean Air Act occurring on or after January 12, 2009.

### FIRST CLAIM FOR RELIEF – CLEAN AIR ACT
### Failure to Properly Store Volatile Petroleum Liquids – Subpart K Tanks

58. Paragraphs 1 through 25 and 37 through 57 are realleged and incorporated herein by reference.

59. Tanks A1, H8, and I9 are all Subpart K Tanks because each tank has a capacity greater than 65,000 gallons and was constructed or modified after June 11, 1973, and prior to May 19, 1978.  40 C.F.R. §§ 60.110(a) and 60.110(c)(2).

60. Based on available shipping manifests, Material Safety Data Sheets ("MSDS"), and contracts for the purchase of the petroleum product, the maximum true vapor pressure of the petroleum product stored at the Facility in 2007 was greater than 11.1 psia.

61. One or more Defendants stored petroleum product with a maximum true vapor pressure of over 11.1 psia in Tank A1 between, at a minimum, March 22, 2007, and August 7, 2007 (139 days).

62. One or more Defendants stored petroleum product with a maximum true vapor pressure of over 11.1 psia in Tank H8 between, at a minimum, May 23, 2007 and August 7, 2007 (77 days).

63. One or more Defendants stored petroleum product with a maximum true vapor pressure of over 11.1 psia in Tank I9 during the following periods: April 11, 2007–May 30, 2007, and June 21, 2007 –August 7, 2007 (98 days total).

64. At all times relevant to this action, Tanks A1, H8, and I9 were not equipped with vapor recovery systems or their equivalent.

65. Defendants stored petroleum liquid with a maximum true vapor pressure greater than 11.1 psia in storage vessels that were not equipped with vapor recovery systems or their equivalent, in violation of 40 C.F.R. Part 60, Subpart K.  40 C.F.R. § 60.112(a)(2).

66. Defendants are liable for civil penalties of $32,500 for each day in which each Subpart K Tank stored a petroleum byproduct with a maximum true vapor pressure greater than 11.1 psia. 42 U.S.C. § 7413(b); 40 C.F.R. § 19.4.

### SECOND CLAIM FOR RELIEF – CLEAN AIR ACT
### Failure to Properly Store Volatile Organic Liquids – Subpart Ka Tanks

67. Paragraphs 1 through 25 and 37 through 66 are realleged and incorporated herein by reference.

68. Tank J10 is a Subpart Ka Tank because it has a capacity greater than 40,000 gallons and its construction commenced after May 18, 1978.  40 C.F.R. § 60.110a(a).

69. Based on available shipping manifests, MSDS, and contracts for the purchase of the petroleum product, the maximum true vapor pressure of the petroleum product stored at the Facility in 2006–2007 was greater than 11.1 psia.

70. One or more Defendants stored petroleum product with a maximum true vapor pressure of over 11.1 psia in Tank J10 at various times between August, 2006, and August 7, 2007, as evidenced by statements from employees of Defendants and ThermaCAM GasFindIR Camera videos showing volatile organic fumes escaping from Tank J10.

71. At all times relevant to this action, Tank J10 was not equipped with a closed vent system or control device.

72. Defendants stored petroleum liquids with a maximum true vapor pressure greater than 11.1 psia in a storage vessel that was not equipped with a closed vent system and control device, in violation of 40 C.F.R. Part 60, Subpart Ka.  40 C.F.R. § 60.112a(b).

11

73. Defendants are liable for civil penalties of $32,500 for each day in which each Subpart Ka Tank stored a petroleum byproduct with a maximum true vapor pressure greater than 11.1 psia.  42 U.S.C. § 7413(b); 40 C.F.R. § 19.4.

## THIRD CLAIM FOR RELIEF – CLEAN AIR ACT
### Failure to Properly Store Volatile Organic Liquids – Subpart Kb Tanks

74. Paragraphs 1 through 25 and 37 through 73 are realleged and incorporated herein by reference.

75.  Tanks B2, C3, D4, and F6 are all Subpart Kb Tanks because each tank has a capacity greater than 75 cubic meters (472 barrels) and was constructed or modified after July 23, 1984.

76. Based on available shipping manifests, Material Safety Data Sheets, and contracts for the purchase of the petroleum product, the maximum true vapor pressure of the petroleum product stored at the Facility in 2007 was greater than 11.109 psia.

77. One or more Defendants stored petroleum product with a maximum true vapor pressure of over 11.109 psia in Tank B2 between, at a minimum, October 6, 2006, and August 7, 2007 (306 days).

78. One or more Defendants stored petroleum product with a maximum true vapor pressure of over 11.109 psia in Tank C3 between, at a minimum, October 6, 2006, and June 12, 2007 (250 days).

79. One or more Defendants stored petroleum product with a maximum true vapor pressure of over 11.109 psia in Tank D4 during the following periods: March 22, 2007 through May 3, 2007 and June 6, 2007 through August 7, 2007 (106 total days).

80. One or more Defendants stored petroleum product with a maximum true vapor pressure of over 11.109 psia in Tank F6 from March 22, 2007 through May 21, 2007 (61 days).

81. At all times relevant to this action, Tanks B2, C3, D4, and F6 were not equipped with closed vent systems and control devices or a system their equivalent.

82. Defendants stored petroleum liquids with a maximum true vapor pressure greater than 11.109 psia in storage vessels that were not equipped with closed vent systems and control devices or a system equivalent, in violation of 40 C.F.R. Part 60, Subpart Kb. 40 C.F.R. § 60.112b(b).

83. Defendants are liable for civil penalties of $32,500 for each day in which each Subpart Kb Tank stored a petroleum byproduct with a true vapor pressure greater than 11.109 psia. 42 U.S.C. § 7413(b); 40 C.F.R. § 19.4.

## FOURTH CLAIM FOR RELIEF – CLEAN AIR ACT
### Failure to Maintain Records of Stored Petroleum Liquids – Subpart K Tanks

84. Paragraphs 1 through 25 and 31 through 83 are realleged and incorporated herein by reference.

85. Tanks A1, H8, and I9 are Subpart K Tanks.

86. One or more Defendants stored petroleum product at the Facility between August, 2006 and August 7, 2007.

87. On or about July 5, 2007, one or more Defendants were requested to produce records of the petroleum liquid stored, the period of storage, and the maximum true vapor pressure of the liquids stored.

88. Defendants provided loading records for April 1, 2007 through June 23, 2007, loading logs for March 23, 2007 through July 5, 2007, and shipping manifests (which showed the vapor pressure of the petroleum byproduct) for May 1, 2007 through June 23, 2007.

89. Defendants were unable to provide any records at all for the period of August 2006 through March 31, 2007.  On information and belief, one or more Defendants stored petroleum product in Tank A1, H8, and/or I9 during some portion of this period.

90.  Defendants were unable to provide information regarding the true vapor pressure of the petroleum byproduct for the period of August 2006 through April 30, 2007.

91. According to shipping records, one or more Defendants recommenced the storage of petroleum liquids at the Facility on or about March 2, 2009.  They did not keep records of the maximum true vapor pressure of these petroleum liquids being stored.

92. On April 8, 2009, Defendants, for the first time, analyzed a sample from Tank A1 for its RVP.

93. From August 2006 through March 22, 2007, Defendants failed to maintain records of the period of storage for Tanks A1, H8, and/or I9 in violation of 40 C.F.R. § 60.113(a).

94. From August 2006 through April 30, 2007, and again from March 2, 2009 through April 8, 2009, Defendants failed to maintain records of the petroleum liquid stored or the maximum true vapor pressure of the liquid stored in Tanks A1, H8, and/or I9 violation of  40 C.F.R. § 60.113(a).

95. Defendants are liable for civil penalties of $32,500 for each day records were not properly maintained for each Tank in 2006 and 2007, and $37,500 for each day records were not properly maintained for each Tank in 2009.  42 U.S.C. § 7413(b), 40 C.F.R. § 19.4.

## FIFTH CLAIM FOR RELIEF – CLEAN AIR ACT
### Failure to Maintain Records of Stored Petroleum Liquids – Subpart Ka Tank

96. Paragraphs 1 through 25 and 31 through 95 are realleged and incorporated herein by reference.

97. Tank J10 is a Subpart Ka Tank.

14

98. Based upon statements by or on behalf of one or more Defendants and observations by EPA and LDEQ inspectors, Tank J10 stored petroleum liquids at various times between August 2006 and August 7, 2007.

99. On or about July 5, 2007, EPA requested that Defendants provide the records of petroleum liquid stored, the period of storage, and the maximum true vapor pressure of the liquids stored at the Facility.

100. Defendants failed to provide any records corresponding to Tank J10.

101. Defendants failed to provide records of the petroleum byproduct stored, the period of storage, or the true vapor pressure of the petroleum byproduct stored in Tank J10, in violation of 40 C.F.R. § 60.115a(a).

102. Defendants are liable for civil penalties of $32,500 for each day records were not properly maintained for Tank J10 in 2006 and 2007. 42 U.S.C. § 7413(b), 40 C.F.R. § 19.4.

## SIXTH CLAIM FOR RELIEF – CLEAN AIR ACT
### Failure to Maintain Records of Stored Petroleum Liquids – Subpart Kb Tanks

103. Paragraphs 1 through 25 and 31 through 103 are realleged and incorporated herein by reference.

104. Tanks B2, C3, D4, and F6 are all Subpart Kb Tanks.

105. On information and belief, at least one of Tanks B2, C3, D4, and F6 stored petroleum liquids between August 2006 and August 7, 2007.

106. On or about July 5, 2007, Defendants were requested to produce records of the petroleum liquid stored, the period of storage, and the maximum true vapor pressure of the liquids stored at the Facility.

107. Defendants provided loading records for April 1, 2007 through June 23, 2007, loading logs for March 23, 2007 through July 5, 2007, and shipping manifests (which showed the vapor pressure of the petroleum byproduct) for May 1, 2007 through June 23, 2007.

108. Defendants were unable to provide any records at all for the period of August 2006 through March 22, 2007, and were unable to provide information regarding the maximum true vapor pressure of the petroleum byproduct for the period of August 2006 through April 30, 2007.

109. Defendants recommenced the storage of petroleum liquids in Tank B2 on or about March 16, 2009, but at that time they did not keep records of the maximum true vapor pressure of the petroleum liquids being stored.

110. On April 8, 2009, Defendants, for the first time, analyzed a sample from Tank B2 for its RVP.

111. From August 2006 through March 22, 2007, Defendants failed to maintain records of the period of storage for Tanks B2, C3, D4, and/or F6 in violation of 40 C.F.R. § 60.116b(c).

112. From August 2006 through April 30, 2007, and again from March 16, 2009 through April 8, 2009, Defendants failed to maintain records of the petroleum liquid stored or the maximum true vapor pressure of the liquid stored in Tanks B2, C3, D4, and/or F6 in violation of 40 C.F.R. § 60.116b(c).

113. Defendants are liable for civil penalties of $32,500 for each day records were not properly maintained for each tank in 2006 and 2007, and $37,500 for each day records were not properly maintained in 2009.  42 U.S.C. § 7413(b), 40 C.F.R. § 19.4.

## SEVENTH CLAIM FOR RELIEF – CLEAN AIR ACT
### Failure to Adhere to Good Air Pollution Control Practices

114. Paragraphs 1 through 25 and 31 through 83 are realleged and incorporated herein by reference.

115. Tanks A1, B2, C3, D4, F6, I9, and J10 are subject to NSPS standards.

116. In September 2006, October 2006, January 2007, and March 2007, LDEQ received complaints regarding odors emanating from the Facility.

117. LDEQ conducted an inspection of the Facility on March 21 through 23, 2007.

118. On March 21, 2007, LDEQ inspectors noted odors originating from Tank J10.  A representative of one or more Defendants stated that the seals on Tank J10 had failed.

119. On March 23, 2007, an LDEQ inspector used a Thermacam GasFindIR camera to detect volatile petroleum vapors escaping from the roof vents of Tanks D4 and F6.

120. On March 23, 2007, the LDEQ inspector also noted a visually leaking valve on Tank F6 with a reading over 10,000 ppm.

121. On April 11, 2007, LDEQ conducted a follow-up inspection, and detected volatile petroleum vapors escaping from the roof vents of tanks A1, B2, C3, D4, F6, and I9.

122. On July 25, 2007, an EPA inspector used a Thermacam GasFindIR camera to detect volatile petroleum vapors leaking from Tanks A1, B2, C3, D4, and F6.

123. One or more Defendants stored petroleum product in Tank A1 between, at a minimum, March 22, 2007, and August 7, 2007 (139 days).

124. One or more Defendants stored petroleum product in Tank B2 between October 6, 2006, and August 7, 2007 (306 days).

125. One or more Defendants stored petroleum product in Tank C3 between October 6, 2006, and June 12, 2007 (250 days).

126. One or more Defendants stored petroleum product in Tank D4 during the following periods: March 22, 2007 through May 3, 2007 and June 6, 2007 through August 7, 2007 (106 total days).

127. One or more Defendants stored petroleum product in Tank F6 from March 22, 2007, through May 21, 2007 (61 days).

128. One or more Defendants stored petroleum product in Tank I9 during the following periods: April 11, 2007–May 30, 2007, and June 21, 2007–August 7, 2007 (98 days total).

129. On March 2, 2009, one or more Defendants began using Tank A1 again, and on March 16, 2009, one or more Defendants began using Tank B2 again.

130. On April 1, 2009, EPA inspectors used a Thermacam GasFind IR camera to detect volatile petroleum vapors escaping from the roof vents of Tanks A1 and B2.

131. One or more Defendants continued using Tanks A1 and B2 until August, 2009.

132. Tanks A1, B2, C3, D4, F6, and I9 are equipped with internal floating roofs that, when working properly, are designed to minimize or eliminate air emissions.

133. Emissions of volatile petroleum vapors out of roof vents are indicators that the internal floating roofs are not properly preventing air emissions from the tanks.

134. Allowing volatile air emissions to emanate from Tanks A1, B2, C3, D4, F6, I9, and J10 is not consistent with good air pollution control practice, in violation of 40 C.F.R. §60.11(d).

135. Defendants are liable for civil penalties of up to $32,500 for each day in 2006 and 2007, and $37,500 for each day in 2009, that each Tank stored petroleum liquids in a manner inconsistent with good air pollution practice. 42 U.S.C. § 7413(b); 30 C.F.R. § 19.4.

## EIGHTH CLAIM FOR RELIEF – CLEAN AIR ACT
### Operating Without a Valid Air Permit

136. Paragraphs 1 through 25 and 31 through 83 are realleged and incorporated herein by reference.

137. Under the Louisiana SIP, Defendants were required to apply for, and receive, an air permit prior to operating the Facility.  54 Fed. Reg. 09795, 40 C.F.R. §§ 52.970(c)(58), 52.999(c)(49) (incorporating into the Louisiana SIP former LAC 33:III:505.A).[1]

138. Defendants never had a valid air permit during operations in 2006-2007.

139. In 2009, one or more Defendants began operating the Facility fourteen days before the air permit was issued.

140. Defendants violated the Louisiana SIP in 2006 and 2009 by operating the Facility without first obtaining an air permit.  54 Fed. Reg. 09795, 40 C.F.R. §§ 52.970(c)(58), 52.999(c)(49) (incorporating into the Louisiana SIP former LAC 33:III:505.A).

141. Defendants are liable for a civil penalty of up to $32,500 for failing to obtain an air permit prior to commencing operations in 2006, and a civil penalty of up to $37,500 for failing to obtain an air permit prior to commencing operations in 2009.  42 U.S.C. § 7413(b); 30 C.F.R. § 19.4.

## NINTH CLAIM FOR RELIEF – CLEAN AIR ACT
### Failure to Include Information in Air Permit Applications

142. Paragraphs 1 through 11 and 31 through 57 are realleged and incorporated herein by reference.

143. Under the Louisiana SIP, Defendants were required to include all pertinent data in the air permit applications.  54 Fed. Reg. 09795, 40 C.F.R. §§ 52.970(c)(58), 52.999(c)(49)

---

[1] While the Louisiana SIP remains in force and is enforceable as approved, the current citation in the Louisiana Administrative Code for this permit requirement is LAC 33:III.501.C.2.

(incorporating into the Louisiana SIP former LAC 33:III:505.H).[2]

144. The permit application submitted on or about January 30, 2009 stated that the material to be stored was crude oil with an RVP of less than 4 psi.

145. Laboratory testing revealed that the material being stored at the Facility in 2009 had an RVP of greater than 10 psi.

146. Defendants violated the Louisiana SIP (as set forth at 40 C.F.R. § 52.999(c)(49), incorporating former LAC:III:505.H) by failing to include all pertinent data in the air permit applications submitted on or about January 30, 2009.

147. Defendants are liable for a civil penalty of up to $37,500 for failing to include all pertinent data in the air permit application submitted in 2009.  42 U.S.C. § 7413(b); 30 C.F.R. § 19.4.

## STATUTORY AND REGULATORY FRAMEWORK
## CLEAN WATER ACT

148. Section 311(b)(3) of the Clean Water Act, 33 U.S.C. § 1321(b)(3), prohibits the discharge of oil or hazardous substances into or upon the navigable waters or adjoining shorelines of the United States in such quantities as the President determines may be harmful to the public health or welfare or the environment of the United States.

149. The Clean Water Act defines the term "discharge" to include "any spilling, leaking, pumping, pouring, emitting, emptying or dumping." 33 U.S.C. § 1321(a)(2).

150. Section 311(a)(l) of the Clean Water Act, 33 U.S.C. § 1321(a)(l), defines "oil" to mean "oil of any kind or in any form, including, but not limited to, petroleum, fuel oil, sludge, oil refuse, and oil mixed with wastes other than dredged spoil."

---

[2] While the Louisiana SIP remains in force and is enforceable as approved, the current citation in the Louisiana Administrative Code for this permit requirement is LAC 33:III.517.D.

151. Section 502(7) of the Clean Water Act, 33 U.S.C. § 1362(7), defines "navigable waters" as "waters of the United States, including the territorial seas."

152. EPA, acting through its delegated authority under Executive Order No. 11735, 38 Fed. Reg. 21243 (Aug. 7, 1973), has determined by regulation that the quantities of oil that may be harmful to the public health or welfare or the environment of the United States include discharges of oil that, *inter alia,* cause a film or sheen upon or discoloration of the surface of the water or adjoining shorelines, or cause a sludge or emulsion to be deposited beneath the surface of the water or upon adjoining shorelines. 33 U.S.C. § 1321(b)(4); 40 C.F.R. § 110.3.

153. Under Section 311(j)(1) of the Clean Water Act, 33 U.S.C. § 1321(j)(1), EPA is required to establish "procedures, methods, and equipment and other requirements for equipment to prevent discharges of oil and hazardous substances from…onshore facilities…and to contain such discharges." EPA has promulgated such Oil Pollution Prevention regulations at 40 C.F.R. Part 112.

154. EPA's Oil Pollution Prevention regulations contain Spill Prevention, Countermeasure, and Control Plan requirements that are applicable to every onshore facility that has oil in a tank with an aggregate above-ground storage capacity of more than 1,320 gallons which is engaged in "drilling, producing, gathering, storing, processing, refining, transferring, distributing, using, or consuming oil and oil products, which due to its location, could reasonably be expected to discharge oil in quantities that may be harmful…into or upon the navigable waters of the United States." 40 C.F.R. § 112.1(b), (d)(2)(ii).

155. EPA's Oil Pollution Prevention regulations require the owner and operator of a covered facility to "construct all bulk storage tank installations (except mobile refuelers) so that you provide a secondary means of containment for the entire capacity of the largest single container

21

and sufficient freeboard to contain precipitation.  You must ensure that diked areas are

sufficiently impervious to contain discharged oil."  40 C.F.R. § 112.8(c)(2).

## TENTH CLAIM FOR RELIEF – CLEAN WATER ACT
### Unlawful Discharge of Oil into Navigable Waters and Waters of the State of Louisiana

156. Paragraphs 1 through 30 and 148 through 155 are realleged and incorporated herein by

reference.

157. On or about June 21, 2007, approximately 205 barrels (8,610 gallons) of petroleum

product spilled out of Tank I9 into the environment.

158. The petroleum product discharged from Tank I9 traveled approximately one hundred

yards down gradient from Tank I9 and entered the Creek.

159. There was a protective dike at the Facility, but the dike was ineffective because a gap

had been cut in the dike.

160. The spilled oil travelled at least two miles down the Creek.

161. Investigators documented dozens of dead animals in the vicinity of the spill, including

fish, crawfish, foxes, rabbits, rodents, birds, frogs, snakes, and turtles.

162. The release of petroleum product from Tank I9 was a "discharge" as that term is used in

Section 301 of the Clean Water Act, 33 U.S.C. § 1321.

163. The spilled petroleum product was "oil" under the Clean Water Act because it was "oil

of any kind or in any form, including, but not limited to, petroleum, fuel oil, sludge, oil refuse,

and oil mixed with wastes other than dredged spoil." 33 U.S.C. § 1321(a)(l).

164. The Creek and its shorelines are "navigable waters" and "adjoining shorelines" under

the Clean Water Act.  33 U.S.C. § 1362(7).

165. The quantity of petroleum product discharged from Tank I9 was a quantity harmful to

the public health or the environment because it caused a film or sheen upon or discoloration of

the surface of the water or adjoining shorelines, or caused a sludge or emulsion to be deposited beneath the surface of the water or upon adjoining shorelines. 40 C.F.R. § 110.3.

166. Defendants are subject to civil penalties in an amount up to $1,100 per barrel of oil discharged.  33 U.S.C. § 1321(b)(7)(A) (as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, and the Debt Collection Improvements Act of 1996, 31 U.S.C. § 3701), 40 C.F.R. § 19.4.

## ELEVENTH CLAIM FOR RELIEF – CLEAN WATER ACT
### Failure to Provide a Secondary Means of Containment

167. Paragraphs 1 through 30 and 148 through 166 are realleged herein and incorporated by reference.

168. The Tanks at the Facility are located within one hundred yards of the Creek, which is a perennial tributary of Fivemile Creek, itself a perennial tributary of Bayou D'Arbonne.

169. The Facility was, during its periods of operation set forth in this Complaint, engaged in the processing, storage, transfer, and/or the distribution of petroleum products.

170. The Facility's aggregate above-ground storage capacity is greater than 1,320 gallons.

171. A discharge of harmful quantities of oil to the navigable waters of the United States from the Facility could have been reasonably expected during the periods of operation described in this Complaint.

172. Defendants violated 40 C.F.R. § 112.8(c)(2) by failing to provide a secondary means of containment for the Facility and/or failing to ensure that the dike was sufficiently impervious to contain oil.

173. Defendants are liable for a civil penalty of up to $32,500 for violating 40 C.F.R. § 112.8(c)(2).  Section 311(b)(7)(C) of the Clean Water Act, 33 U.S.C. § 1321(b)(7)(C); 40 C.F.R. § 19.4.

## STATUTORY AND REGULATORY FRAMEWORK
## RCRA

174. RCRA was enacted to promote and protect "health and the environment and to conserve valuable material and energy resources" by establishing a comprehensive program for regulating the generation, transportation, treatment, storage, and disposal of hazardous waste. 42 U.S.C. § 6902(a).

175. Pursuant to its authority under RCRA, EPA has promulgated regulations at 40 C.F.R. Parts 260 through 272. These regulations generally prohibit treatment, storage, and disposal of hazardous wastes without a permit, and provide detailed requirements governing the activities of persons who generate hazardous waste and persons who are lawfully permitted to store, treat, and dispose of hazardous waste.

176. EPA may authorize a state to administer a RCRA program in lieu of the federal program when it deems the state program to be substantially equivalent to the federal program. 42 U.S.C. § 6926.

177. The EPA Administrator granted final authorization to the State of Louisiana to administer its Hazardous Waste Management Program on January 25, 1985, effective February 7, 1985. 50 Fed. Reg. 3348; *see also* 40 C.F.R. § 272.951.

178. The United States may enforce the federally approved State hazardous waste management program by filing a civil action for injunctive relief and civil penalties. 42 U.S.C. § 6928.

179. In Louisiana, the hazardous waste program is managed by the Louisiana Department of Environmental Quality ("LDEQ"), pursuant to the Louisiana Environmental Quality Act, LSA-RS §§ 30:2001–2588, and the rules and regulations promulgated thereunder in Title 33, Part V of the Louisiana Administrative Code ("LAC").

180. Under LAC 33:V.109(1)(a) [40 C.F.R. § 261.2(a)(1)], "solid waste" is defined as any discarded material.  Under LAC 33:V.109(1)(b) [40 C.F.R. §261.2(a)(2)], a discarded material is any material which is abandoned, recycled, considered inherently waste-like, or a military munition.  Materials are solid wastes if they are abandoned by being (1) disposed of, (2) burned or incinerated, or (3) accumulated, stored, or treated before or in lieu of being disposed of, burned, or incinerated.  LAC 33:V.109(2) [40 C.F.R. § 261.2(b)].

181. Under LAC 33:V.109 [40 C.F.R. § 261.3], "hazardous waste" is defined as a solid waste that exhibits any of the characteristics of hazardous waste (ignitability, corrosivity, reactivity, or toxicity), is a listed hazardous waste, or is a mixture of a solid waste and one or more hazardous waste(s).  A solid waste exhibits the hazardous characteristic of toxicity if, using the Toxicity Characteristic Leaching Procedure, Test Method 1311, a representative sample of the waste contains any of the contaminants listed in that section at a concentration equal to or greater than the respective regulatory level.  LAC 33:V.4903(E)(1) [40 C.F.R. § 261.24(a)].

182. The regulatory level for benzene is 0.5 mg/L.  Under LAC 33:V.4903(D)(2) [40 C.F.R. § 261.24(b)], a solid waste that exhibits the characteristic of toxicity for benzene has the EPA Hazardous Waste Number of D018.

183. If a characteristic hazardous waste is mixed with a solid waste, the resulting mixture is hazardous unless it does not exhibit a characteristic.  LAC 33:V.109(3)(c) [40 C.F.R. § 261.3(b)(3)].

184. A "generator" is defined as "any person, by site, whose act or process produces hazardous waste identified or listed, or whose act first causes a hazardous waste to become subject to regulation."  LAC 33:V.109 [40 C.F.R. § 260.10].

185. A person who generates a solid waste must determine if that waste is a hazardous waste either by applying the required test method or by applying his or her knowledge of the hazardous characteristic of the waste in light of the materials or the process used.  LAC 33:V.1103 [40 C.F.R. § 262.11].

186. An owner or an operator of a facility may not store hazardous waste without a permit. Section 3005(a) of RCRA, 42 U.S.C. § 6925(a); LAC 33:V.303.B [40 C.F.R. 270.1(b)].

187. If a person generates a hazardous waste, the hazardous waste must be disposed of within 90 days to avoid the permit requirement.  LAC 33:V.1109(E) [40 C.F.R. § 262.34].

188. Section 3008(a) of RCRA, 4 2 U.S.C. § 6928(a), as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, and the Debt Collection Improvements Act of 1996, 31 U.S.C. § 3701, as set forth at 40 C.F.R. § 19.4, authorizes: a civil penalty of up to $32,500 per day for each violation of Subtitle C of RCRA, 42 U.S.C. §§ 6921 *et seq.*, occurring on or after March 16, 2004 through January 11, 2009, and a civil penalty of up to $37,500 per day for each violation occurring on or after January 12, 2009.

## TWELFTH CLAIM FOR RELIEF – RCRA
### Storing Hazardous Waste without a Permit

189. Paragraphs 1 through 30 and 174 through 188 are realleged and incorporated herein by reference.

190. There are at least five roll-off boxes at the Facility which contain hazardous waste.

191. The previous owner/operator of the Facility tested the wastes in the roll-off boxes and determined that they were hazardous based on their characteristic of toxicity caused by benzene.

192. Defendants continue to store the contents of the roll-off boxes.

193. Defendants have never acquired permits from LDEQ which would allow them to store hazardous wastes, in violation of Section 3005(a) of RCRA, 42 U.S.C. § 6925(a), and LAC 33:V.303.B [40 C.F.R. § 270.1(b)].

194. Defendants are liable for civil penalties of $32,500 for each day in which the Defendants stored hazardous waste in each roll-off box without a permit between March 16, 2004 and January 11, 2009, and up to $37,500 per day for each violation occurring on or after January 12, 2009. 42 U.S.C. § 6928(a); 40 C.F.R. § 19.4.

## THIRTEENTH CLAIM FOR RELIEF – RCRA
### Failure to Make an Adequate Hazardous Waste Determination

195. Paragraphs 1 through 30 and 156 through 194 are realleged and incorporated herein by reference.

196. In the aftermath of the oil spill in June 2007, Defendants built a dam across the Creek and drained the Creek three times between June 23, 2007 and July 6, 2007.

197. The contaminated water that was drained from the Creek was placed in Tank K11.

198. In response to rainfall the week of July 6, 2007, Defendants removed storm water around the tank battery section of the Facility and placed the storm water in Tank K11.

199. Between June 23, 2007 and July 6, 2007, approximately 7,500 barrels, or approximately 315,000 gallons, of contaminated creek water and storm water were placed in Tank K11.

200. The material in Tank K11 was a "solid waste" because the material was abandoned by being accumulated, stored, or treated (but not recycled) before or in lieu of being disposed of, burned, or incinerated.  LAC 33:V.109 [40 C.F.R. § 261.2(b)(1)].

201. Defendants did not attempt to make a hazardous waste determination for the contaminated water in Tank K11 until approximately December 21, 2007.

202. On or about December 21, 2007, a contractor hired by Defendants took four analytical samples of the liquid in Tank K11. Those samples exhibited the hazardous characteristic of toxicity caused by benzene (Hazardous Waste No. D018).

203. By storing the contaminated Creek water and storm water, Defendants generated the hazardous waste. LAC 33:V.109 [40 C.F.R. § 260.10].

204. From on or about July 6, 2007 to on or about December 21, 2007, Defendants failed to make an adequate hazardous waste determination for the solid waste generated by storing the contaminated Creek water and storm water in violation of LAC 33:V.1103 [40 C.F.R. § 262.11].

205. Each Defendant is liable for civil penalties of up to $32,500 per day for each day they failed to make a hazardous waste determination. Section 3008(a) of RCRA, 42 U.S.C. § 6928(a), 40 C.F.R. § 19.4.

## FOURTEENTH CLAIM FOR RELIEF – RCRA
### Storing Hazardous Waste Without a Permit

206. Paragraphs 1 through 30 and 156 through 205 are realleged and incorporated herein by reference.

207. The owner or operator of a facility may temporarily store hazardous waste without a permit when the storage is undertaken as part of an immediate response to a spill. After the immediate response activities are completed, however, any treatment, storage, or disposal of spilled material must be covered by a permit or emergency permit. LAC 33:V.305.C.9 [40 C.F.R. § 270.1(c)(3)(i),(ii)].

208. Between June 23, 2007, and July 6, 2007, Defendants placed Creek and storm water contaminated with petroleum material into Tank K11.

209. Analytical sample results from samples collected from Tank K11 show that the liquid material exhibited the hazardous characteristic of toxicity caused by benzene (Toxicity No. D018).

210. Immediate response activities ceased on July 6, 2007, the day Lisbon stopped putting contaminated water into Tank K11.

211. Defendants did not dispose of the contaminated water in Tank K11 until May 6, 2008.

212. From July 6, 2007, when liquid material was placed in Tank K11, until May 6, 2008, when all remaining liquid material was removed from Tank K11, Defendants did not have a permit for its storage of hazardous waste at the Facility, in violation of Section 3005(a) of RCRA, 42 U.S.C. § 6925(a), and LAC 33:V.303.B [40 C.F.R. § 270.1(b)].

213. Defendants are liable for civil penalties of $32,500 for each day in which the Defendants stored hazardous waste in Tank K11 without a permit. 42 U.S.C. § 6928(a); 40 C.F.R. § 19.4.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, the United States of America, respectfully prays that this Court provide the following relief:

1. An injunction requiring Defendants to cease all ongoing RCRA violations, which will require, *inter alia*, the categorization of solid wastes and the disposal of hazardous wastes that are currently present at the Facility;

2. Other injunctive relief as necessary to prevent future violations of the Clean Air Act, Clean Water Act, RCRA, the Louisiana Environmental Quality Act, and their associated regulations;

3. An assessment of civil penalties against each Defendant for each violation of the Clean Air Act, the Clean Water Act, RCRA, the Louisiana Environmental Quality Act, and their associated regulations, in an amount up to $32,500 per day for violations between March 15, 2004 and January 11, 2009, and up to $37,500 per day for violations after January 12, 2009, and up to $1,100 per barrel for the oil spill.

4. An award to the United States of America for the costs of this action; and,

5. Such further relief as this Court may deem appropriate.

IGNACIA S. MORENO
Assistant Attorney General
Environment & Natural Resources Division
U.S. Department of Justice

/s/ A. Nathaniel Chakeres
A. NATHANIEL CHAKERES
Trial Attorney
Environmental Enforcement Section
Environment & Natural Resources Division
U.S. Department of Justice
601 D Street NW
P.O. Box 7611
Washington, DC 20044-7611
(202) 616-6537 (telephone)
(202) 514-8395 (facsimile)
Aristide.chakeres@usdoj.gov


STEPHANIE A. FINLEY
United States Attorney
JOHN BROADWELL
Assistant United States Attorney
United States Attorney's Office
Western District of Louisiana
300 Fannin Street, Suite 3201
Shreveport, LA 71101
(318) 676-3600 (telephone)
(318) 676-3642 (facsimile)
John.broadwell@usdoj.gov

Of Counsel:
ANGELA HODGES
Associate Regional Counsel

CARLOS ZEQUEIRA
Associate Regional Counsel
Office of Regional Counsel
U.S. Environmental Protection Agency, Region 6
1445 Ross Avenue, Suite 1200
Dallas, TX 75202